## DOUGHTY v. ROCKINGHAM NAT. BANK.

District Court, D. New Hampshire.
Jan. 9, 1933.

William H. Sleeper, of Exeter, N. H., for the bank.

Elbridge Anderson, of Boston, Mass., for trustee.

MORRIS, District Judge.

This is an action brought by James E. Doughty, trustee in bankruptcy of the estate of the Consumers' Lumber Company, against the Rockingham National Bank to recover the sum of $12,879.80 alleged preferential payments made by the bankrupt to the bank within four months next prior to the filing of the petition in bankruptcy.

Upon trial before the court the following facts appear: The Consumers' Lumber Company, bankrupt, is a corporation organized in 1928 under the laws of the commonwealth of Massachusetts with its principal place of business at Andover in said commonwealth. It was engaged in the business of storing, drying, manufacturing, and selling lumber in the wood heel trade.

On May 11, 1931, it filed a voluntary petition in bankruptcy, was adjudicated a bankrupt, and on June 8, 1931, James E. Doughty was elected and duly qualified as trustee.

The defendant is a national bank organized under the laws of the United States with its principal place of business in Exeter, N. H.

In 1928, the bank began transacting business with one Herbert W. Bowler, who was doing business at Andover, Mass., under the name of the Consumers' Lumber Company. Shortly thereafter Bowler incorporated his business, which corporation is now the bankrupt. It purchased a plant at Brattleboro, Vt., where the bulk of its business was carried on.

The early transactions of the bankrupt with the defendant bank were the ordinary banking transactions in which money and trade acceptances were deposited and checked out by the corporation.

Beginning October 29, 1928, the bank made numerous loans to the bankrupt. The manner of handling the loans was as follows: The Consumers' Lumber Company gave the bank its note or notes on sixty or ninety days'

time which were discounted by the bank and credited to the company's liability ledger account. When the note came due, if not paid, the Consumers' Lumber Company would give the bank its check for the face of the note which would be charged to the company's account and a new note given for a like amount and credited to the company to keep its account good.

The following tabulation shows the several transactions. The notes followed by an asterisk were secured by personal mortgages on lumber located at the Consumers' Lumber Company's plant at Brattleboro, Vt.

of which mortgages describe certain car numbers with the number of feet of lumber therein.

The first mortgage was given April 7, 1930, for $12,000 and recorded in the town clerk's office, Brattleboro, Vt., April 14, 1930. It secured four promissory notes as follows: $4,500 note due June 2, 1930; $2,500 note due June 18, 1930; $2,500 note due June 26, 1930; and $2,500 note due July 2, 1930. This mortgage was discharged June 4, 1930.

The second mortgage was dated June 4, 1930, and recorded in the town clerk's office at Brattleboro June 23, 1930. It was for

| Date | Maker | No. | Am't | When Due | When Paid |
|---|---|---|---|---|---|
| **1928** | | | | | |
| Oct. 29 | C. L. Co. | 1923 | $2500 | Jan. 29, 1929 | |
| **1929** | | | | | |
| Jan. 29 | " | " | " | | Jan. 29, 1929 |
| Jan. 29 | " | 2188 | 2500 | May 29, 1929 | |
| May 29 | " | " | " | | May 29, 1929 |
| June 3 | " | 2733 | 2500 | Sept. 3, 1929 | |
| June 3 | " | 2754 | 2500 | Oct. 3, 1929 | |
| " 20 | " | 2785 | 2500 | Sept. 18, 1929 | |
| Sept. 12 | " | 2785 | 2500 | | Sept. 12, 1929 |
| " 5 | " | 3037 | 2500 | Dec. 4, 1929 | |
| " 18 | " | 3073 | 2500 | Dec. 17, 1929 | |
| " 25 | " | 2754 | 2500 | | Oct. 5, 1929 |
| " 25 | " | 3162 | 2500 | Jan. 3, 1930 | |
| Nov. 6 | " | 3037 | 2500 | | Dec. 4, 1929 |
| Dec. 5 | " | 3387 | 2500 | March 5, 1930 | |
| " 5 | " | 3073 | 2500 | | Dec. 17, 1929 |
| " 18 | " | 3465 | 2500 | March 18, 1930 | |
| **1930** | | | | | |
| Jan. 2 | " | 3162 | 2500 | | Jan. 4, 1930 |
| " 2 | " | 3530 | 2500 | April 2, 1930 | |
| " 2 | " | 3526 | 4500 | March 3, 1930 | |
| March 20 | " | 3465 | 2500 | | March 20, 1930 |
| " 22 | " | 3832 | 2500 | June 18, 1930* | |
| " 22 | " | 3387 | 2500 | | March 27, 1930 |
| " 26 | " | 3870 | 2500 | June 26, 1930* | |
| " 26 | " | 3530 | 2500 | | April 2, 1930 |
| April 4 | " | 3526 | 4500 | | April 4, 1930 |
| " 3 | " | 3909 | 2500 | July 2, 1930* | |
| " 2 | " | 3908 | 4500 | June 2, 1930* | |
| June 3 | " | 3908 | 4500 | | June 3, 1930 |
| " 4 | " | 4275 | 4500 | Sept. 2, 1930* | |
| " 4 | " | 3832 | 2500 | | June 18, 1930 |
| " 4 | " | 4341 | 2500 | Sept. 16, 1930* | |
| " 4 | " | 3870 | 2500 | | June 25, 1930 |
| " 4 | " | 4361 | 2500 | Sept. 24, 1930* | |
| " 4 | " | 3909 | 2500 | | July 7, 1930 |
| " 4 | " | 4407 | 2500 | Sept. 30, 1930* | |
| Sept. 9 | " | 4275 | 4500 | | Sept. 9, 1930 |
| " 9 | " | 4658 | 4500 | Dec. 2, 1930* | |
| " 15 | " | 4341 | 2500 | | Sept. 27, 1930 |
| " 15 | " | 4750 | 2500 | Dec. 15, 1930* | |
| Nov. 15 | " | 4407 | 2500 | | Nov. 15, 1930 |
| " 15 | " | 4361 | 2500 | | Nov. 15, 1930 |
| " 15 | " | 4750 | 2500 | | Nov. 15, 1930 |
| " 15 | " | 4658 | 4500 | | Nov. 15, 1930 |
| Oct. 11 | " | 5089 | 2500 | Dec. 29, 1930* | |
| " 11 | " | 5090 | 2500 | Dec. 23, 1930* | |
| " 11 | " | 5091 | 2500 | Dec. 15, 1930 | |
| " 11 | " | 5092 | 4500 | Dec. 2, 1930 | |
| March 2 | " | 5092 | 4500 | | March 2, 1931 |
| " 2 | " | 5091 | 2500 | | March 3, 1931 |

Some of the notes were secured by mortgages on lumber in the Brattleboro yard, all $12,000 and secured four promissory notes as follows; $4,500 due September 2, 1930;

$2,500 due September 16, 1930; $2,500 due September 24, 1930; and $2,500 due September 30, 1930. It has not been discharged.

The third mortgage, undischarged, was dated October 11, 1930, and recorded in the town clerk's office at Brattleboro November 4, 1930. It was for $12,000 made to secure four promissory notes as follows: $4,500 due December 2, 1930; $2,500 due December 15, 1930; $2,500 due December 23, 1930; $2,500 due December 29, 1930.

The undischarged mortgage of June 4, 1930, contains the following description of property upon which security was given: "All lumber, boards and timber contained in all dry kilns at the Brattleboro Last and Wood Heel Company, Brattleboro, Vt., also certain cars described as follows:" Then twelve car numbers are enumerated and also a quantity of lumber delivered by trucks, in the whole containing 200,712 feet.

The description in the mortgage of October 11, 1930, was practically the same covering fifteen car numbers and a quantity of lumber delivered by trucks, totaling 203,210 feet.

Some time in August 1930, the firm of Woodward & Leach attached all of the personal property of the Consumers' Lumber Company at its plant in Brattleboro, and about four days thereafter the Consumers' Lumber Company for the purpose of releasing the attachment and liquidating the debt executed and delivered to Woodward & Leach a bill of sale covering certain lumber at the Brattleboro plant. At the same time the Consumers' Lumber Company executed and delivered to Woodward & Leach a lease of a building in which the lumber mentioned in the bill of sale was stored, and Woodward & Leach signed an agreement acknowledging receipt of the possession of the lumber. Mr. Bowler, an officer and agent acting for the corporation, represented that the bill of sale covered none of the property included in the bank's mortgages, but I find it more probable that it did.

The bill of sale by its terms transferred title from the Consumers' Lumber Company to Woodward & Leach of 114,170 feet of "rock maple lumber." It was dated August 26, 1930.

In the latter part of November, 1930, Lyman Pope, one of the directors of the bank, went to Brattleboro for the purpose of checking up 193,000 feet of lumber covered by the bank's mortgages. He found only about 100,000 feet estimated. He learned that there was another building in which about 110,000 feet was stored and upon making inquiry was shown a copy of the bill of sale given by the company to Woodward & Leach and on his return he reported the same to the bank. This was the first information the bank had regarding the bill of sale.

After Pope's visit to Brattleboro, the bank feared that the Consumers' Lumber Company had transferred some of the lumber contained in its mortgages to Woodward & Leach and on December 2, 1930, sent William H. Sleeper, attorney for the Rockingham National Bank, to Brattleboro to ascertain the existing condition of affairs. Mr. Sleeper went to the office of Mr. Clauson, attorney for Woodward & Leach, where he met Woodward and Leach and was shown their bill of sale. He found that the bank was faced with a situation whereby it had either to go to law on the question of title to the lumber mentioned in the bill of sale or settle with the parties and rely on the lumber as additional security for the amount owed the bank. After a telephone conversation with officers of the bank, he was instructed to pay Woodward & Leach the balance of their claim, get a bill of sale from them, and take possession under the mortgages of all lumber mentioned therein.

Mr. Sleeper gave Woodward & Leach his check for $6,532.15 (Exhibit E), and on the same date took a bill of sale from them of 111,877 feet of rock maple lumber then separated and stored in the west half of a building known as "Old Last Block Storage House" on Vernon street in Brattleboro.

The general description in the bill of sale is followed by a more particular description of sizes and number of feet of each size.

It appears that there were four Sturtevant kilns containing lumber which was not covered by the bank's mortgages. All of the other lumber except that enumerated in the bill of sale was claimed by the bank under its mortgages and Mr. Sleeper took possession of the same. Mr. Bowler of the Consumers' Lumber Company was present with Mr. Sleeper and they agreed how it should be handled in the future. The lumber in the kilns other than the Sturtevant kilns was marked with car numbers and was pointed out to Mr. Sleeper by Mr. Bowler as lumber covered by the bank's mortgages. Mr. Sleeper in describing what he did testified as follows:

"The Witness: There were two mortgages, and a part of the cars, I think all but five cars on the first mortgage had gone out, and there were five cars that were covered by both

mortgages, and Mr. Bowler compared them with me or for me and tried to show me where the lumber was to make up enough, and I could not see that it was all there, but I was satisfied that there was about 110,000 feet still there that was not under that bill of sale.

"The Court: You were satisfied by a comparison of the car numbers with the markings on these piles?

"The Witness: Yes, from his pointing it out in the office, and when we went around to see it that it was the same lumber, although the exact number of cars I could not remember now, nor the exact figures, but it seemed to be about one half divided between the planer room and the kilns.

"The Court: And you were satisfied of this when you saw the books in the office, and you also went over the ground itself? A. Yes, sir. I spent sometime looking over the kilns and what he had done to the kilns."

In order to keep possession, Mr. Sleeper employed one Clarence Morse to act as keeper. Sleeper and Morse went to the storage house and measured separate piles but could find only about 75,500 feet of lumber covered by the bill of sale. Morse was unwilling to be responsible for more than that amount and a memoranda was given him for the purpose of limiting his liability (Defendant's Exhibit H).

Mr. Morse later asked to be relieved of his duties, and the bank sent a man from Exeter, a Mr. Irvine, to look after its interests. Irvine's letter of instructions from the bank was as follows:

"December 27, 1930.
"Mr. Andrew S. Irvine
"9 Clifford Street
"Exeter, N. H.
"Dear Sir:
"This letter is to authorize you as agent for the Rockingham National Bank of Exeter, N. H. to take possession of all the kiln-dried and finished maple lumber and of all the unfinished maple plank in the kilns upon the premises of the Consumers' Lumber Company at Brattleboro, Vermont, and to keep the same in your possession for the Bank, taking such a way to do so as will insure us against the removal of the property by any other party.

"You are taking possession of the finished lumber of the West half of the building known as 'The old last block storage ware house' by virtue of our bill of sale from the Consumers' Lumber Company dated December 2, 1930. And as to the other lumber up-

on the premises, we have possession taken by William H. Sleeper about Dec. 2nd, 1930, which we want you to renew and make more positive by taking actual charge of the lumber. Mr. Sleeper left Clarence E. Morse in charge, but on account of sickness we understand he is no longer able to attend to it.

"The possession taken for breach of conditions of mortgages held by the Bank relates to all the lumber now upon the premises which is described in either of the copies of mortgages sent herewith, except, (of course) the lumber which you are taking under our bill of sale, a copy of which is also enclosed for you.

"Very truly yours, F. W. Peet,
"Enc./VMN Cashier"

Some time after Sleeper's visit to Brattleboro, probably about December 21, there was a fire at the plant in the building in which the lumber contained in the bill of sale was stored, and while not much of the lumber was burned it was considerably injured by water so that it had to be kiln-dried. There was also considerable waste. The bank had placed insurance on this lumber after it took the bill of sale, and the fire damage was settled February 24, 1931, for the sum of $7,529.89. The check in settlement was made out to the Consumers' Lumber Company and the Rockingham National Bank as its interest might appear.

It further appears in evidence and I find that within five months prior to May 11, 1931, and subsequent to the date of the last mortgage, the Consumers' Lumber Company purchased from A. H. Shaw of Gilmanton Iron Works, N. H., three shipments of maple plank, air-dried, as follows: December 4, 1930, 11,067 feet; January 14, 1931, 8,326 feet; January 16, 1931, 8,056 feet—a total of 27,449 feet. The lumber was shipped from Alton Bay to Haverhill, Mass. It was not covered by any of the bank's mortgages or its bill of sale from Woodward & Leach. I find that the Consumers' Lumber Company sold a part of the Shaw lumber to the Fellows Wood Heel Company of which Frank N. Hall, president of the defendant bank, was manager.

On the miscellaneous sales ledger of the Consumers' Lumber Company, I find charges to the Fellows Wood Heel Company between January 1, 1931, and April 17, 1931, of lumber amounting to $9,274.69. I am able to find and trace the application of checks paid on this account by the Fellows Wood Heel Company directly to the Rockingham National Bank as follows:

February 26, 1931, $2,041.63.
March 31, 1931, $2,461.58.
April 27, 1931, $650.74.
May 6, 1931, $2,767.48.

Upon receipt of the last-mentioned check the account appears to be balanced, but the figures above given do not equal the amount of the charges. When and how the remaining $1,353.26 was paid and what application was made of it I am unable to determine.

On March 31, 1931, $808.92 of the amount represented by the first two checks was applied on the note number 5090. $1,435.32 was applied on the amount advanced on the bill of sale. Other amounts were applied to interest on the several notes and to the general balance against the Consumers' Lumber Company. Checks were paid to the bank by the Fellows Wood Heel Company and applied as follows: $650.74 was applied on note No. 5090; $2,767.48 was applied on the balance of note 5090 and interest and on note 5089. It is apparent that such money received from the Fellows Wood Heel Company as paid for Consumers' Lumber Company shipments of wood from Haverhill, Mass., paid for wood upon which the bank had no claim.

Hereinafter the several lots of wood will be separated into and considered under three headings, namely: Lumber covered by the Woodward & Leach bill of sale, lumber taken possession of under the bank's mortgages, and shipments of lumber from Haverhill, Mass. But before considering further the disposition of lumber and proceeds therefrom it seems proper to determine certain preliminary questions.

In order to obtain the relief sought in the petition, it is necessary that the complainant establish by a preponderance of evidence:

I. That the company was insolvent;

II. That within four months of the bankruptcy it procured or suffered a transfer of its property, the effect of which will be to enable the defendant to obtain a greater percentage of its debts than other creditors of the same class; and

III. That the defendant had reasonable cause to believe that the transfer would result in a preference.

The burden of proving the existence of each of the three principal elements is upon the complainant. In re Klein Moffett Co. (D. C.) 28 F.(2d) 523; Gratiot County State Bank v. Johnson, 249 U. S. 246, 39 S. Ct. 263, 63 L. Ed. 587; McGill v. Commercial Credit Company (D. C.) 243 F. 637.

The period within which the alleged preferences were given and received is within the period of four months next prior to the filing of the petition in bankruptcy, namely, between the 11th day of January, 1931, and the 11th day of May, 1931. The bank had been dealing with the Consumers' Lumber Company since 1928.

The commercial relations of the parties within a reasonable time prior thereto as well as the transactions alleged to result in a preference are material in reaching a conclusion. See Clifford v. Morrill (D. C.) 230 F. 190; Baxter v. Ord (C. C. A.) 239 F. 503; Bank of Commerce v. Brown (C. C. A.) 249 F. 37; First National Bank of Lake Benton v. Galbraith (C. C. A.) 271 F. 687.

Defendant's counsel argue that there is no competent evidence from which the court can determine that the corporation was insolvent at the time the alleged preferences were given, and counsel further say that the schedules filed by the bankrupt are inadmissible against the alleged preferred creditor to prove the bankrupt's insolvency. See Bergdoll v. Harrigan (C. C. A.) 217 F. 943; Rosenman v. Coppard (C. C. A.) 228 F. 114; (contra) In re Docker-Foster Co. (D. C.) 123 F. 190.

Be this as it may, it appears to me that there is sufficient evidence from which I should find and do find that the corporation was insolvent and that the bank had reason to believe that it was insolvent as early as December 2, 1930.

In the case of Rosenberg v. Semple (C. C. A.) 257 F. 72, 73, it is said: "Direct and detailed evidence of the facts constituting insolvency is not essential. Owing to its nature, insolvency is not always susceptible of direct proof. It may, and in many cases must, be proved by the proof of other facts, from which the ultimate fact of insolvency may be presumed or inferred."

It is true that there is no direct evidence of the value of the Brattleboro real estate. It is not necessary for the court to consider the bankrupt's schedules in order to reach a conclusion that there is little or no equity in the Brattleboro plant. It does appear that it was purchased at a cost which with improvements exceeded $50,000 with only a small down payment (Exhibit 12), and that a local bank in Brattleboro held a mortgage on the property and was pressing the corporation for payments on the principal and interest (Exhibit 8). It further appears that

when such property as came into the hands of the trustee was sold at auction, the machinery and equipment were not sold because of mortgages thereon (Exhibit 4).

It also appears that in the summer of 1930 Woodward & Leach attached the lumber in the bankrupt's yard at Brattleboro in an effort to secure their pay for lumber sold the corporation and that they took in settlement of their claim a bill of sale of 114,170 feet of lumber.

The taking of mortgages of what should be revolving assets of the corporation after its failure to reduce its loans, the taking of possession under its mortgages on December 2, 1930, of all the lumber in the Brattleboro yards, except such as was contained in four Sturtevant kilns, and other acts of the officials of the bank, indicate a state of mind showing that not only the bank had reason to believe but did believe that the corporation was financially embarrassed as early as December 2, 1930. I find that it was bankrupt, and I further find that beginning in December, 1930, down to the filing of the petition in bankruptcy the bank was using every means in an effort to secure the payment of the corporation's indebtedness to it regardless of rights of any other creditors.

On January 15, the bank was informed by letter that the corporation had no way of meeting freight bills and other running expenses and would like 50 per cent. of certain payments to be credited in order to have some working capital. In the same letter it appeared to be anxious about such other bills as were pressing and it wanted capital to settle them to prevent any one disturbing what "is now a fairly quick adjustment of its affairs."

In reaching the foregoing conclusion I have not found it necessary to consider the voluntary petition of the bankrupt filed May 11, 1931, or the schedules therein.

### Woodward & Leach Bill of Sale.

As hereinbefore stated, Woodward & Leach took in settlement of their claim against the Consumers' Lumber Company a bill of sale covering 114,170 feet of lumber which was separated from other lumber in the yard and stored in a building by itself. It was the intention to transfer title to Woodward & Leach and the bill of sale was effective for the purpose. On December 2, 1930, Woodward & Leach for and in consideration of $6,545.95 transferred its title to 111,877 feet to the Rockingham National Bank. The bank felt that a portion of the lumber was covered by mortgages and I am inclined to believe that such was the fact notwithstanding the statements made by Bowler to Sleeper (see testimony of Peet). I so find. My reason for so finding is that the bank's mortgage given June 4, 1930, was supposed to cover 200,712 feet of lumber, and on December 2d when Sleeper and Morse made an estimate of the lumber in the yard they could find only about 100,000 feet.

It further appears from the testimony and from exhibits in the case that on or befor December 2d, two cars of the lumber included in the bill of sale had been shipped to the Hy-Grade Wood Heel Company of Haverhill, Mass., and that another car was ready for shipment to the Brooklyn Wood Heel Company, of Brooklyn, N. H., the proceeds of which were paid the bank leaving an estimated amount of lumber under the bill of sale of 75,502 feet. The bank continued its sales of the same until it reduced the sum paid to Woodward & Leach down to $3,440.-13, which amount it charged to the Consumers' Lumber Company. When asked why this was done, the cashier of the bank testified that a national bank could not engage in the lumber business and it was a method of keeping its books straight.

The way the proceeds were handled by the bank as a mere matter of bookkeeping cannot be said to affect the title to the lumber purchased under the bill of sale, as it does not appear that the corporation ever exercised any dominion over it subsequent to the giving of the bill of sale by Woodward & Leach to the bank, neither did it attempt to exercise any control over the proceeds derived from it. In re Looschen Piano Case Co. (D. C.) 259 F. 931. The effect of the bookkeeping entries was to credit the cash receipts against the cash paid out.

I have already mentioned the fact that there was a fire resulting in considerable damage to the lumber and that the bank received from the insurance company $7,529.89. This the bank applied March 2, 1931, in settlement of note No. 5092, $4,500, and note No. 5091, $2,500, and the rest to the general indebtedness of the corporation which was then $15,440.13, made up of $12,000 in notes and the $3,440.13 to which reference is made above.

I hold that when the bank purchased the rights of Woodward & Leach, and took possession under both its bill of sale and mortgage of June 4, 1930, title to the lumber was transferred absolutely to the bank and it was at liberty to sell the same and did sell the

same and had a right to make such application of the proceeds as it desired.

The trustee in bankruptcy is not entitled to recover under this branch of the case.

## Lumber Covered by Mortgages.

As already indicated, Mr. Sleeper took possession December 2, 1930, of such lumber as he could identify and such as was pointed out to him as lumber covered by the mortgages. Morse was left in possession, and later Irvine was sent there as agent of the bank to look after its interests.

From the testimony I find that possession was taken of practically all of the lumber at the plant except that in the Sturtevant kilns. The lumber was manufactured and shipped and returns made to the bank. The bank advanced money after January 12, 1931, to meet the payrolls.

The burden of proof as between the trustee and the bank is on the trustee to satisfy the court that the bank got pay for lumber not covered by its mortgages. This burden he has not sustained. It is true that the books of the bankrupt show purchases of lumber amounting to 145,847 feet subsequent to the date of the last mortgage and sales amounting to 325,847 feet. The last figures include sales of lumber under the bill of sale, sales from Haverhill, Mass., sales of lumber identified under the mortgage, and sales not included in either of the three classes.

The court is unable to find the exact amount of footage sold from any one of the three divisions. When the bank took possession under the mortgages, title to such lumber as was described in the mortgages vested in the bank subject to the right of redemption by the mortgagor. This appears to be the law in Vermont. Campbell v. Bryant, 98 Vt. 486, 490, 129 A. 299; Mason v. Sault, 93 Vt. 412, 415, 108 A. 267, 18 A. L. R. 1426; Mower, Trustee, v. McCarthy, 79 Vt. 142, 64 A. 578, 7 L. R. A. (N. S.) 418, 118 Am. St. Rep. 942; In re Rogers & Woodward (D. C.) 132 F. 560, 562. Its title related back to the dates of the mortgages. Thompson v. Fairbanks, 196 U. S. 516, 524, 25 S. Ct. 306, 49 L. Ed. 577. The bank had a legal right to sell the mortgaged lumber and apply the proceeds to the debtor's mortgage notes even if done within the four months' period prior to bankruptcy, and the taking possession, sale, and application of the proceeds is not under the circumstances of this case held to be a preference.

If the Consumers' Lumber Company intermingled the mortgaged lumber with other lumber of its own so it could not be identified by the mortgagee, it was the duty of the company to sort it out. This Bowler did or pretended to do, and on the evidence I am unable to find that he included lumber other than that described in the mortgages. To attempt to do so would be merest guess.

## Haverhill Lumber.

Mention has already been made of lumber shipped to the Consumers' Lumber Company, Haverhill, Mass., by A. H. Shaw. His first shipment was of 11,067 feet December 6, 1930. I find that on January 31, 1931, the Consumers' Lumber Company shipped this out from Haverhill as follows: 4,664 feet to the Hy-Grade Wood Heel Co., price $277.51. 6,403 feet to Fellows Wood Heel Company, price $416.21.

On the same date further shipment of 18,012 feet was shipped from Haverhill to the Fellows Wood Heel Company, price $1,463.65. I am unable to find that this was Shaw lumber, as all of that is otherwise accounted for as hereinafter appears. However, there is no evidence indicating that the bank ever had any legal claim on it. The bank received the pay for it and the 6,403 feet of Shaw lumber above mentioned, a total of 187,986, and applied it on the indebtedness of the Consumers' Lumber Company. The Hy-Grade Wood Heel Company filed a petition in bankruptcy in April, 1931, with no assets, so that the 4,664 feet of Shaw lumber shipped to it January 31, 1931, was a total loss.

On February 11, 1931, the Consumers' Lumber Company delivered by truck from Haverhill, 16,382 feet of rock maple to the Fellows Wood Heel Company, price $1,064.83. This corresponds with the balance of lumber purchased of Shaw, namely, 8,426 feet and 8,056 feet. The variance in figures between the above and Shaw's testimony is explained by letter (Exhibit 23) and is due to a difference in scale. A check for this lumber was sent by the Fellows Wood Heel Company to the Rockingham National Bank and was applied by the latter to the Consumers' Lumber Company's indebtedness. There were numerous other shipments made to the Fellows Wood Heel Company from Brattleboro, Vt., identified by car numbers, payments for which were made directly to the bank; but so far as I am able to ascertain from the testimony and exhibits such shipments were made out of lumber of which the bank had taken possession either under its mortgages or bill of sale. I find that when the bank accepted payment from the Fellows

Wood Heel Company for lumber shipped from Haverhill not covered by its mortgages or its bill of sale, that it was intended to give the bank a preference, and the bank had reasonable cause to believe that the Consumers' Lumber Company was insolvent, and that the effect was to enable it to obtain a greater percentage of its debts than other creditors of the same class of which there were many, and that it was intended by the bankrupt to give, and the bank to receive, a preference.

The trustee is entitled to recover from the Rockingham National Bank the following sums, with interest since the date of the bill of complaint, March 16, 1932, and costs:

Proceeds of shipment from Haverhill, Mass., Jan. 31, 1931:

| | |
|---|---|
| Paid by Fellows Wood Heel Co. to Bank..... | $1,879.86 |
| Proceeds of like shipment, Feb. 11, 1931...... | 1,064.83 |
| Total ...................................... | $2,944.69 |